Good morning, Your Honors. Maxwell Bleacher for the Plaintiff Appellant, Mvuinvestors. Could you keep your voice up, please, Mr. Bleacher? The central message I'd like to deliver is that the district court's view that no reasonable jury could find for the plaintiff on the facts of this case is just untenable. And without making a jury argument, I'd like just to spend a few minutes to tell you that if you look at the facts steadily and wholly, it's clear that there is a justiciable controversy which requires jury resolution. Could you tell me what the strongest evidence is that there was a genuine issue of fact and where to find it in the excerpts on whether they actually had a deal as opposed to that they were in the process of making a deal? Let me clarify my question. I keep running across things like at ER 181, he said he was still talking to a third party firm and in that period everything was going fine. And going means not gone, still going. It looks as though everything was going fine. They expected to have a deal, but it never got brought up because those two conditions that the customers liked the machine and that the patent package was the company wanted never really got resolved to where the company was willing to make the deal. Well, the evidence for Mr. Slutsky's testimony, which under the law, I believe you have to accept this proof. Okay, what is the best of it? You're right about the law. The supplemental excerpt of the record 353 and the supplemental excerpt of the record 156 is very affirmative that during the March 22nd conversation with Mr. Ishraq, who everyone calls Omar, that a deal was cut and the deal was for a $3 million down payment. Hold on. I looked at SCR 156 and 353 must be ER. There are a multitude of references to Mr. Slutsky's repeated testimony that the deal consisted of buying all the MVU patent portfolio. Well, wait. 156 says in March 2008 when Ishraq asked you about the deal and you guys came to a final agreement and it was subject to the condition that the patents be as represented. Yeah. Correct. There were two conditions subsequent that Mr. Ishraq opposed and that Mr. Slutsky admitted and both were satisfied. Why do you call them conditions subsequent and what difference does it make? It's just that they were conditions. Well, I think that they had a deal and what he's saying is the deal is subject to my two things. My checking the patent portfolio to make sure it's so it doesn't really make any difference whether you call them subsequent. I don't think so. That's just no. It doesn't make any legal significance. I just go back to contract. Following up on Judge Kleinfeld's question, if you take all the if you take everything that Mr. Slutsky said is true, don't you still end up with considerable ambiguity and uncertainty regarding whether or not the second condition was satisfied? No, he was told Mr. Slutsky was told that the second condition was set. Well, show me in I read his deposition and I am to be honest with you, Mr. Bleacher. I didn't see that particular statement the way you just articulated it. My note showed it. It's an E.R. volume two at one sixty one and one sixty three. You're talking about the so this would be on one sixty one. There's a question. The only facts you have to support your position that there was the due diligence relating to the patents was successful. That deals with the first condition. That one sixty one those seem to deal with the first condition. And on one sixty three, he talks about how the patents checked out perfectly. And he was only waiting for some information back from a marketing firm they had hired, which relates to the second condition. I think the second condition was basically the customers like the machine market for it. It's an E.R. one eighty four. One eighty four and E.R. three thirty one. Let's check one eighty four first. Let's see. There it says a question, but you don't intend to include that. Mr. Manetti told you that condition two had been satisfied and they weren't going to interview any more customers. Right. I don't know. And this was the answer. I don't know that he said he would never interview another customer, but condition two had been satisfied. Everything was fine. Mr. Manetti told him on several occasions that both of the conditions had been satisfied. So that's what you rely on is that statement right there. Yes, of course. What was the other one? Well, there's another one and that's three thirty one. Three thirty one. Three thirty one. OK, I'll have to check that one. I don't have three thirty one with me. I got it here. I think that's the wrong page number. It's an e-mail from Stoltenberg to the net. Maybe it's the right page number. Oh, here it is. Oh, yes, that's it. Stoltenberg. Yes. It says we're hearing a lot of positive feedback from rheumatologists. Well, I guess my question, though, is. And it says we're going to be wrapping that up next week. I mean, there was every indication that he got, every internal indication, every communication from Mr. Manett. Was that the conditions were both satisfied? And I need to point out that email was more ambiguous because it says competitor. You say, oh, see, scam may provide better information than the Magnum. You do the Magnum. It looks like they're checking out whether they can make money. They were checking this. This was a product principally was principally going to be marketed to rheumatologists to diagnose rheumatoid arthritis. And obviously, although they had previously sold the same product, they wanted now several years later to update their information and determine what the market for it was. And let me point out that although Mr. Manett acknowledged that Mr. Slutsky told him repeatedly he had a deal with Omar. And in fact, Mr. Slutsky writes a memo to Omar himself saying, do we have a deal? There is not a single document internally or to Mr. Slutsky from General Electric, which denies that the deal was made. Not a single document. They never said, Kenny, what are you nuts? We don't have a deal. Nobody ever said that to him and nobody ever wrote that to him. And more importantly, they never wrote that internally. Internally, the two people who were the closest to Omar. Was there anything in writing that there was a deal? No. But that's why God invented juries. This is not a slam dunk case. It's a close statute that requires a written document. No, it doesn't. They hadn't gotten that far yet. Well, I think they understood that at the end, obviously, there had to be some document evidencing the sale. I don't imagine General Electric statute patent law pretty clear. You can't move a patent from point A to point B without it. And I think Mr. Slutsky acknowledged that at the end of the transaction, there would be some writing bill of sale or otherwise that would evidence the transaction. Which would have satisfied the statute of fraud, which is otherwise satisfied because it could have been performed within a year. That's not a real issue, not a genuine issue. Was there any substitute for writing any part performance or anything? No. Instead, the statute of frauds is satisfied because it was no question that they could have sold 100 machines within a year. When they were the distributor, when they bought our machine, placed their name and logo on it and sold it as a General Electric product, they sold 65 machines in seven months with one salesman. So if they had put their mind to it, there isn't any question that a jury could find. They could have sold 100 machines within one year, which would have satisfied the 10 million dollar residual obligation. And let me point out, it's not only that they didn't ever say to Kenny, you don't have a deal. The two people closest to the transaction with Omar, which were Stoltenberg and Mr. Manette, have a memorandum in which they say they don't know what kind of deal Kenny, Omar made. Well, they speculated on, quote, what Omar promised or did not promise to Kenny. In other words, the people very closest to him, who presumably would have known there was no deal, didn't know. And they didn't know he didn't make a promise to Kenny. What was that page that you just read from? That's ER 061 in volume two, Your Honor. So that document, plus the fact that at no time, despite Mr. Manette's acknowledgement that he kept saying he had a deal, did General Electric ever say or write to him that, no, we don't have a deal? Let me say what I think the reluctance may have been in the district court that concerns me. You make a very good what would be a common law argument in any other state and a state statutory law argument in this state that there is a contract. Yes. And as a matter of ordinary experience, people who have made or have read records of other people making contracts with big bureaucratic outfits like General Electric or the U.S. government know that you go on forever and they say everything's fine and then sometimes they let you down. And until you have the written deal, you have nothing with them. They have so many layers of bureaucracy. An argument Judge Kleinfeld that I would expect Mr. Ellis to make to the jury and which may have impact. This is not a slam dunk case. They have a lot of good evidence. Are there any words that can get over that argument in addition to the ones you've pointed out that would be very satisfactory? Well, all I can tell you is that they discussed six things on on March 22nd. And let me kind of just run through them quickly. OK. Both Mr. Ishraq acknowledged that there were discussions of numbers. He says he didn't agree to any numbers. He said the numbers emanated from Kenny. But yes, he said there were numbers about an upfront payment and a payoff. So at least there's an acknowledgement that that subject came up. OK. Then there was an agreement on this due diligence process on checking out the patents and the customers. Their testimony on that was essentially uniform. They both agreed that that was discussed and agreed upon. And that was something General Electric was going to do. And then Omar acknowledged that he's that he told Kenny he wanted the champion. Somebody at MVU who would go out and really go gung ho for this product. He acknowledged that was discussed and agreed upon. And then he said Omar acknowledged that they discussed that when they bought the machine, that it would assign it to the lunar division and that it would be under Omar's control and direction. They all agreed on that. Then two other things came up. And that is Kenny said that this was Omar's pet project. And Omar said, I can't remember whether I said that or not. Not a term I would normally use, but I can't deny that I might have attributed that I might have said something to that effect. And then there was a discussion. There was no discussion. Kenny said there was no discussion about Mr. Israq's authority to do this deal. And Mr. Israq said he had no recollection of any such discussion either. So if you look at the totality of the discussion taken, taken as a whole, there's remarkable agreement between the two men as to what was discussed. The only point of divergence is whether the discussion of an upfront amount and a payout was agreed to or just discussed and not agreed to. And if you take Mr. Slutsky's testimony, sworn testimony, and you apply the rule that this court has established in Leslie versus Grupo and Liu versus McLaughlin, summary judgment is not appropriate. There is a jury issue. Okay, you're over your time, but I'll give you a minute for rebuttal. Let's hear from GE Capital, I believe. May it please the Court. My name is Dennis Ellis. I'm a partner at the law firm of Paul Hastings, Janowski & Walker. I'm privileged to represent General Electric Company in this matter, and in particular its division in Waukesha, Wisconsin, GE Healthcare. Counsel, help me with something that bothers me in this case. I don't think it matters at all that Slutsky's statements are self-serving. They're supposed to be. I wrote a decision some way that says why would he bother the court with him on summary judgment if they didn't help his case? And it doesn't concern me that there's some difference in whether they agreed on the terms between Slutsky and the GE people. That's why you have jury trials to reserve. I do not understand why there's no writing from General Electric that says we don't have a deal until you have a deal in writing. It's very common when negotiations are going on to have a letter of intent that says we expect to make a deal along these lines. We don't have a deal until it's in writing and signed by people at this level of our bureaucracy. Sometimes during negotiations somebody sends a letter that says looks like we're going to have a deal, but you understand we don't have one until something's in writing. Was there some communication like that that I overlooked or some statement like that internally within GE or to Slutsky or in any other form? Certainly, Your Honor, there was. Where is it? More importantly, there were several statements from Slutsky to GE that we have no deal. That's the critical fact. Point to them. I remember Slutsky saying he'd like to have something in writing, but California law is you can have a subsequent writing to memorialize a deal that's already made. So what I want to do is see where GE says or where Slutsky says, preferably both, we don't have a deal until it's in writing. We did this for the trial court, Your Honor, to try to make it easy.  SER 28 through 32, in particular SER 26 through 27, it's actually a demonstrative evidence we used at the trial court to explain all the series of documents that came out, whereby Slutsky himself acknowledged that there was only an outline of a deal or an agreement to agree. If you look, you can see. Wait, this is nothing. I don't think. I'm looking at an exhibited trial. It's all blue-colored and stuff, but I'm not looking at the original declaration by anyone. No, you're not, Your Honor, but this helps you. And I pointed that to the court's attention because I thought that it might help the court point out each individual piece. Every document reference on this document is in the record. I don't know what I'm looking at here, and I can't see it in context. What am I looking at? This was a demonstrative exhibit that we provided to the court at the trial court that listed every single instance where Mr. Slutsky had said that there was no deal in place. If the court would like to more specifically look at the underlying documents that are referenced on this demonstrative exhibit, they are in our brief at pages 28 through 30, and they are referenced verbatim there. You want me to take the reference from page 26 and look at your brief, which will have a reference to the excerpts where I can find what I want to find? Well, I was going to try and get it in easy fashion, but I can give you each one. SCR 417. In that document, it says Mr. Slutsky said, It has been over a week, and I haven't heard a peep. I have not received one piece of paper from the business development folks letting me know that there was a deal. SCR 417. SCR 260-263. He writes to GE, not sure we will ever get this done. SCR 418. SCR 263-264. You're going too fast for me to write it down. I've got 417 and 260-63. Let's see, 417. Okay, 417 looks like email from somebody named David Roy to Kenny Slutsky. So that would be General Electric communicating to Slutsky, right? No, that's Mr. Slutsky communicating with his person that's supposed to shepherd this deal for him. It says from Roy to Slutsky. Right, and the lower email is from Slutsky to him, saying we don't know we'll ever get this done. Okay, from Slutsky to ISHRAC, I haven't heard a peep. Can I provide you something else so we can move this along? I have not received one piece of paper. That's March 30th, Your Honor. Okay, do you have something stronger than that that evinces an understanding that we don't have a deal until I get a piece of paper? Let's try 408. Okay. SCR 408. Okay. Mr. Roy writes to Mr. Slutsky saying it's been so long since we haven't finalized the document. Perhaps you should suggest to GE that they enter into not a final agreement even at this point, Judge Kleinfeld, a letter of intent, an LOI. Mr. Slutsky writes to Mr. Manette at GE saying, how about this? This sounds like a good idea. Let's at least do an LOI. Not the final agreement, a written document, a letter of intent to memorialize that we are moving forward on this deal. And Mr. Manette writes back and says, I'll check, but I don't think we'll be comfortable with that. Okay, now we're getting somewhere. Was there – so what this does is, as Slutsky is still goosing them to do something, and they say, well, maybe we'll do a letter of intent that will be a preliminary to an intended deal structure. I disagree. Mr. Slutsky suggests that they should do an LOI, and GE writes back and says, no, not yet. So not only are we not going to do a written agreement, we're not going to even document that there's a letter of intent to buy your company. That's more dramatic than not having a final written document. More dramatic than that. Mr. Slutsky – Okay, this I understand now. I think there was one more that you wanted us to look at, and I missed the page number. There's several. There's several, and that's why I pointed to the demonstrative exhibit. But if the court doesn't like that, let's look at Mr. Slutsky's testimony directly. Good. Mr. Slutsky knew there needed to be a written agreement. He testified to that. This is in the record at SER 275 through 276. This is under questioning by me. Is this ER? SER, Your Honor. SER. What about ER? It's not in the ER. It's in the supplement. It's in the record. All right. Okay. I don't have it. Okay. 275 and 6. If I may proceed?  This is under questioning by me during the deposition. Mr. Bleacher was defending Mr. Slutsky. I asked questions, and Mr. Slutsky gave answers under oath. Question. Well, why did you need an LOI to get your cash when you already had a definitive agreement as of March 2008? We needed a final agreement. We needed anything to get done. Question. You needed a final agreement to? Answer. We needed a one-line. This is what Omar and I talked about. It could literally be one page. That Magnaview LLC hereby was agreed to sell all the IP it foreclosed on that was formerly owned by the corporation. And GE hereby agrees to purchase that IP for $3 million with a $2 million royalty. Very simple deal. Question. And so that was something that you needed to make the deal close. You needed that final one-word written agreement. Is that right? Answer. I would have expected that yes. Question. And you needed that to make the deal close, right? Answer. Well, I don't think it would have closed without that one deal. Before money transfers, I believe that that would have been it. Question. You would have had to have that written. Even if it was one line in writing between GE Healthcare and MVU, you would have needed that writing before the deal could close. Right? Answer. If Manette hadn't tried to kill the deal and let Omar handle it, I think I would have had this deal closed back a month prior. But when Manette got involved, I just got frustrated again. Question. And so my statement is correct, is that you would have had to have that written one-line agreement you described between GE Healthcare and MVU. Answer. We would have had a one-page agreement, very simple agreement, that I sold everything that I foreclosed onto them for that price. Question. And you needed that one-page simple agreement before you could close and get your money. Right? Answer. It would have been closing. It would have been simultaneous. We would have both done it. That was what the July date was, after they checked the IP and talked to their customers. Question. And that never happened. Right? Answer. No, it never happened. That's not colorful testimony. That's not self-serving testimony. That's not controverted testimony. That's the testimony from the lone witness proffered by the plaintiffs in this case. What does the record show about the status of that second phase of due diligence on marketing, on talking to people who had used the equipment, how does it work out for you, and so on? What was the status of that? You asked that question to Mr. Bleacher, and I'd like to answer it for you. It shows that it wasn't completed. Take a look at SCR- Where? Take a look at supplemental excerpt of record 62 through 64. What is that? That's the testimony of Mr. Slutsky. Which page of the deposition was it? Court's indulgence, let me get that page for you, Your Honor. Your Honor, that's Mr. Slutsky's deposition testimony, page 275, line 15. Were the supplemental excerpts of record at 62-64? Through 64, and the deposition testimony at page 275, beginning at line 15, going through page 277, line 16. And Judge Goodwin, there's a couple key questions and answers, again, by me to Mr. Slutsky, Mr. Bleacher present. Okay, this is that line, begins at line 24. Okay, so he never did tell you that. I finished doing the third-party work in interviewing the customers, and that's done. Answer, he said everything he'd done to date was fine, but I don't know what finish meant. I don't know that he was doing what he was doing, or who he was talking about to. Did he ever tell you that the process of interviewing the few applause customers had concluded? Did Mr. Manette ever tell you that? Answer, he acknowledged that I sent him the list of all the customers and thanked me for that, and said he was talking to them. Question, is that a no? Answer, no. I don't know what he said. I don't recall specifically. I'm sorry. Question, let me try the question again. Did Mr. Manette ever tell you that the process of interviewing a few applause customers has concluded? Yes or no. I don't recall. He said he had interviewed a few applause customers. Yes. Question, did he ever tell you that the process of interviewing customers had concluded? Yes or no. Answer, I don't recall. Question, did he ever tell you that he had interviewed all the customers, and that process had concluded, and now condition two was satisfied? No. He said that the ones he had spoken to, everything was fine, and so everything was satisfied. I don't know how many he talked to. I have no idea. He never said it was concluded. That's their testimony. Well, let me ask you one other thing that concerns me. When I was in practice, letters of intent tended to give rise to litigation because one side would say they were a contract and the other side would say they weren't, and the language often wasn't clear. When they were used legitimately, they were often used so that the party that would get the money could get financing. He'd show the letter of intent to the bank, and that was good enough so that the bank would loan money that would enable him to develop what he was selling, pursuant to the letter of intent. Was there any discussion in this case about whether the contemplated letter of intent that you showed us the emails about had to do with financing or whether it had to do with sketching out the terms of a proposed deal? It had nothing to do with finance, and it had everything to do with GE's deal protocol. Let's assume. So Slutsky, there was no testimony that Slutsky needed the letter of intent to borrow enough money from the bank so he could build enough of the machine, something like that? No, there was actual testimony that he needed a letter of intent to satisfy GE's deal protocol, and that's in the record. I'm running a little bit out of time, but I want to give the assignment. Answer Judge Kleinfeld's question. SCR 342-343. There was nothing that had to do with finance. That's GE's deal protocol. The interesting part here is that we cited a case to the court, Goodworth Holdings v. Shue, 239F sub 947. That's a Northern District, California case, a 2002 case. In that case, at page 958 of that opinion, the court says, In determining whether a party did not intend to be bound until a final document was executed, custom may be decisive. On this particular case, GE had a deal protocol where it said that they had to do a letter of intent before they can go on to the next phase of due diligence. That was critical here because Mr. Slutsky had done a prior deal with General Electric Company. He had done a prior licensing deal with them. In that space, they went through every step of the deal protocol. They did a letter of intent. When Mr. Slutsky is writing to them asking for a letter of intent on this deal, he already had prior experience knowing that you have to do a letter of intent before you can move to the next phase. In fact, on top of all of that, he did a 30-page written document in that prior deal. What does Goodworth say? Goodworth says that may be decisive. So let's believe in the fanciful world. Okay, you're over your argument time. Conclude your remarks. Let's believe in the fanciful world. The General Electric Company and their 1,300 in-house lawyers are letting some guy in Waukesha, Wisconsin, enter into a $13 million deal on a telephone call. Mr. Slutsky knew that was impossible. One final point, Your Honor. Take a look at SCR 66. This really goes to our sanction argument. I didn't get a chance to address the cross-appeal, but if the court looks at that document, I think it will get our point. Look at that document. Mr. Slutsky's own handwriting in the margin of that document says, Omar. It mentions Omar, and it talks about Joe Hogan. He's the guy above Omar that must approve a deal. Mr. Slutsky knew that Omar couldn't agree to that on the phone. All right, thank you. Thank you, Mr. Ellis. Mr. Bleach, I'll give you a minute. Thank you, Your Honor. On condition two, I'd invite your attention to ER 230, which is a very detailed study done by a third party at the behest and paid for by General Electric, which is dated July 22, 2008. Now, obviously, General Electric did not share this with him. He could only get with Mr. Manette. And the evidence is clear that Mr. Slutsky and Mr. Manette did not have good chemistry and did not get along. And so there was a sort of a hostility. But this is the study on which they relied. And it was done. It was done. They interviewed all the rheumatologists that they needed. And on the last document that we saw where Mr. Ellis left out is that when Mr. Slutsky was confronted with that. So is your point that even though they completed this study, that they couldn't conclude that they didn't want to go forward with the deal? They just had the opportunity. Is that what you're saying? That can't be what you're saying. If they made an agreement on March 22, the answer is this. This could have been a basis to terminate the agreement because of what they found out. But it wasn't. And they never relied on that. So there was if there was an oral agreement subject to these two conditions, whether you call them preceding or subsequent, then. And those were satisfied. And they never said they weren't satisfied. Then the contract. What's your reply to what your adversary said about SCR 275 and six were in his deposition? Slutsky seems to be saying they didn't have a deal till they got something in writing. I don't think he said that. I think he said he expected that there would be writing because he's he's he's a lawyer by training and an experienced businessman. And I think he knows General Electric isn't going to give him a check and receive a patent portfolio without some written evidence of that. That's obvious. But of course, the law is, as you observe, Judge Kleinberg, that if there's a forcible written oral contract, that the fact that the parties understand it will be reduced to writing doesn't affect the validity of the oral contract. It depends on whether they mean for the writing to be a memorialization of a contract already made. That is why of the contract. That is why we need a jury trial. Okay. That's one of the issues the jury would get to decide. Thank you, Mr. Bleacher. Thank you, counsel. We appreciate your arguments and matters submitted. And we'll be in recent court. This session of the court will be in recess until 10 o'clock.
judges: Goodwin, Kleinfeld, Paez